UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 16 CR 723 |
| v. | |
| RONALD COLEMAN | Honorable Charles R. Norgle |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING
FACTORS AND RESPONSE TO DEFENDANT'S
OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSH, JR., United States Attorney for the Northern District of Illinois, submits the following position paper as to sentencing factors and response to defendant's objections to the presentence investigation report. For the reasons set forth below, the government respectfully requests that this Court sentence defendant, RONALD COLEMAN, to a term of imprisonment at the low end of the guidelines range of 97 to 121 months, a sentence well-supported by the factors to be considered under Title 18, United States Code, Section 3553(a).

I.    **OFFENSE CONDUCT**

Defendant's conduct was presented during trial in this matter, is set forth in the Presentence Investigation Report (the "PSR") and the Government's Version of the Offense ("GVO"), and is summarized below.

From March 2013, through June 12, 2014, defendant was a Chicago Police Officer assigned to work with the Drug Enforcement Administration ("DEA"). In connection with his assignment with the DEA, defendant had access to information

relating to a federal grand jury investigation into the drug trafficking organization operated by the Conservative Vice Lord street gang on the West side of Chicago near Douglas Park. The federal grand jury investigation, known as Operation Five Leaf Clover, included the use of federal court-authorized wiretaps of the targets' telephones, physical and electronic surveillance, controlled purchases of narcotics by confidential informants and undercover officers, and seizures of narcotics and firearms. As a trusted part of the investigative team, defendant participated in all of the above-referenced investigative techniques used in connection with Operation Five Leaf Clover. During the course of the federal grand jury investigation, Rodney Bedenfield was identified as the primary heroin supplier to this Conservative Vice Lord drug trafficking organization, and Dewan Davis was identified as an associate of Bedenfield.

As of June 2014, defendant was a long-time acquaintance of Davis and Davis's cousin Laron Conway. Defendant first met Conway and Davis when they attended Providence St. Mel High School in Chicago together in the late 1980s. Conway and defendant both played on the high school basketball team.

On June 5, 2014, as part of his work on Operation Five Leaf Clover, defendant conducted surveillance of Davis meeting with Bedenfield at a residence on the 1600 block of South Trumbull Avenue in Chicago. The same day, defendant positively identified a photograph of Davis as the individual he observed meeting with Bedenfield that day. As of June 5, 2014, the team intended to execute the arrest and search warrants for Operation Five Leaf Clover on June 12, 2014, and had already

2

identified over 30 potential targets to arrest, and approximately 10-12 potential houses to be searched. As part of the investigative team, defendant knew of these plans.

On June 9, 2014, at approximately 9:30 a.m., defendant had a telephone call with Conway, during which call defendant confirmed with Conway that Davis was Conway's cousin, and then instructed Conway to tell Davis to cut out and clean up whatever illegal activity Davis was involved in because the police were coming to search 10-12 houses soon. In addition, defendant told Conway to tell Davis that the police would be searching Davis's house and that defendant did not want to walk into a house and see Davis. Conway then made multiple attempts to reach Davis. On June 10, 2014, Conway talked to Davis over the telephone and passed on the information he learned from defendant. Soon thereafter, Davis talked to Bedenfield over the phone on approximately four occasions. *See*, GVO, Exhibit A. On that day, the investigative team had federal court authorization to wiretap Bedenfield's telephone and intercepted these four telephone calls between Davis and Bedenfield.

As a result of hearing these telephone calls, surveillance officers were deployed to Bedenfield's residence on South Spaulding. A surveillance officer observed Bedenfield leave his South Spaulding residence with bags that he then transported to a residence located on South Christiana Avenue.

On June 12, 2014, Chicago Police officers and DEA agents executed over 30 federal and state arrest warrants, and 8 federal search warrants in connection with Operation Five Leaf Clover, including arresting Bedenfield and searching the

residences associated with him, including the Trumbull, Spaulding, and Christiana residences. During the search of the Christiana residence, officers discovered heroin, firearms, and narcotics trafficking paraphernalia. *See* GVO, Exhibit B.

## II.  THE GUIDELINES CALCULATIONS

### A.  The Guidelines Enhancements

#### 1.  Base Offense Level

The base offense level is 26, pursuant to Guideline § 2X3.1. PSR at 7. More specifically, pursuant to Guideline § 2K2.1(a)(1), the base offense level of the underlying offense is 26. *Id.* Pursuant to Guideline § 2K2.1(b)(1)(A), the offense level is increased by 2 levels because the offense involved between 3 and 7 firearms. *Id.* Pursuant to Guideline § 2K2.1(b)(6)(B), the offense level is increased by 4 levels because Bedenfield possessed the firearms in connection with another felony offense, namely conspiracy to possess with intent to distribute heroin. *Id.* Pursuant to Guideline § 2X3.1(a)(1), the base offense level is 6 levels below the offense level for the underlying crime, which is thus 26. *Id.* at 7-8.

#### 2.  Abuse of Trust

Pursuant to Guideline § 3B1.3, the offense level is increased by 2 levels because as a Chicago Police Officer, defendant abused a position of public or private trust in a manner that significantly facilitated the commission of this offense. PSR at 8. Defendant's objection to the application of this enhancement is without merit. Defendant's actions in passing sensitive law enforcement information about upcoming police activity is exactly the type of abuse of a position of trust this enhancement contemplates. *See, e.g., United States v. Bailey*, 227 F.3d 792, 802

4

(7th Cir. 2000) ("Police officers occupy positions of public trust, and individuals who have apparent authority of police officers when facilitating the commission of an offense abuse the trust that victims place in law enforcement."); *United States v. Gould*, 983 F.2d 92, 94 (7th Cir. 1993) (affirming the § 3B1.3 enhancement for police officer that passed investigation-related information to drug trafficking conspirators); *see also United States v. Sierra*, 188 F.3d 798, 802 (7th Cir. 1999) (same); *United States v. Parker*, 25 F.3d 442, 450 (7th Cir. 1994) (same). Therefore, the abuse of trust enhancement is properly applied in this matter.

### 3. Obstruction

Pursuant to Guideline § 3C1.1, the offense level is increased by 2 levels because defendant willfully obstructed the administration of justice with respect to the prosecution of the instant offense of conviction by lying under oath during the trial in this matter. PSR at 8. Defendant's objection to this enhancement is likewise without merit. Defendant concedes that he testified at trial and that the jury returned a verdict of guilty. However, he ignores the practical reality of those facts, which is that by convicting him, the jury necessarily found his testimony was not credible, thus the § 3C1.1 obstruction enhancement is appropriate. *See United States v. Williams*, 553 F.3d 1073, 1082 (7th Cir. 2009) (affirming § 3C1.1 enhancement where defendant testified falsely at trial); *United States v. Contreras*, 937 F.2d 1191, 1194 (7th Cir. 1991) (same). Defendant argues that the jury's decision to believe Conway's testimony over defendant's testimony did not amount to perjury. That argument rings hollow because defendant did, in fact, commit perjury when he testified that his call to Conway was about a picnic. This testimony was wholly inconsistent than Conway's

5

testimony, which was that defendant passed on a warning to Davis about the impending searches and arrests. For the jury to convict, they necessarily found Conway's testimony to be credible and defendant's testimony to be a lie. Defendant's complete failure to assist his own team in investigating the leak further corroborated Conway's testimony, because defendant knew that the investigation would lead to him. If his call with Conway was truly innocuous, then he would have immediately disclosed that fact to his team and his supervisors because he too would have wanted to know which police officer put his fellow officers at such significant risk by leaking that information. Defendant's testimony thus meets the definition of perjury because defendant testified falsely as to a material fact underlying the obstruction charge, and he did so with the willful intent of misleading the jury in order to avoid a conviction. *See, e.g.*, *United States v. Chychula*, 757 F.3d 615, 619 (7th Cir. 2014).

Defendant also challenges this enhancement on constitutional grounds, arguing that by levying the obstruction enhancement, the Court will be punishing him for going to trial. This argument likewise fails. "Consistent with the Supreme Court's decision in *Dunnigan*, we have repeatedly rejected constitutional challenges to obstruction enhancements based on material and willful testimony that was found to be incredible." *United States v. Stenson*, 741 F.3d 827, 831 (7th Cir. 2014) (citing *United States v. Dunnigan*, 507 U.S. 87, 96 (1993)); *see also United States v. Williams*, 553 F.3d 1073, 1081-82 (7th Cir. 2009) (upholding obstruction of justice enhancement despite the "chilling effect" on a defendant's right to testify.); *United States v. Jackson*, 300 F.3d 740, 749 (7th Cir. 2002) ("the Supreme Court has explicitly held

that a defendant cannot contend that section 3C1.1 is unconstitutional on the simple basis that it distorts a defendant's decision to testify or remain silent."); *United States v. Emerson*, 128 F.3d 557, 563 (7th Cir. 1997) ("§ 3C1.1 is not intended to punish a defendant for exercising his right to testify, but the guideline does punish those who commit perjury when denying their guilt.").

For all of these reasons, the obstruction enhancement pursuant to Guideline § 3C1.1 properly applies in this case. The total adjusted offense level is thus 30.

### B. Criminal History

Defendant has 0 criminal history points and his criminal history category is I.

### C. The Guidelines Range

An offense level of 30, when combined with the criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 97 to 121 months of imprisonment.

### III. THE SECTION 3553(A) FACTORS SUPPORT A SENTENCE AT THE LOW END OF THE ADVISORY GUIDELINES RANGE

A sentence at the low end of the advisory guidelines range of 97 to 121 months of imprisonment is warranted under the Section 3553(a) factors. Further, such a sentence is sufficient, but not greater than necessary, to comply with the Section 3553(a) factors.

### A. Nature and Circumstances of the Offense

Defendant was a trusted member of his narcotics squad at the Chicago Police Department. Defendant breached that trust, and his sworn duty as a law enforcement officer, when he passed law enforcement sensitive information about a covert drug

trafficking investigation to a friend from high school. The purpose of passing that information was to warn another friend from high school. However, as defendant well knew, that high school friend was also an associate of one of the investigative team's primary targets: the heroin supplier to a drug trafficking organization operated by the Conservative Vice Lord street gang.

Defendant detailed the significant sentences received by the heroin supplier (Bedenfield) and the upper echelon of that street gang, all well over 15 years in prison. Notably, those sentences serve to highlight the serious nature of that investigation, and thus the serious nature of defendant's breach of trust. However, defendant provided these sentences to argue that the investigation and prosecution was not impacted by his conduct. Defendant misses the point. As defendant well knows from his significant experience working long-term wiretap investigations, law enforcement does not typically continue to engage in wiretap intercepts up through the date of the arrests. In fact, the investigation is typically completed well in advance of the arrests and searches in order to ensure the evidence is fully developed for prosecution. For unrelated circumstances in this case, the police continued to wiretap Bedenfield's telephone. But for that interception, the police would not have known of the leak, would not have deployed the surveillance, would not have observed Bedenfield move the contraband to the Christiana residence, and thus would not have searched the Christiana residence and seized the contraband.

In other words, if the investigation had proceeded as it would in most cases, and the police were not continuing the wiretap through the date of the arrests, then

the following would not have been seized by law enforcement that day: approximately 403.2 grams of heroin, a loaded Glock .40 caliber semi-automatic handgun, a loaded Pietro Barretta 9mm semi-automatic handgun, a loaded Daewoo Precivion Ind 9mm semi-automatic handgun, a Sig Sauer 9mm chrome semi-automatic handgun, a Smith and Wesson .40 caliber semi-automatic handgun, and an Essential Arms Inc. .223 caliber rifle, along with a litany of drug trafficking paraphernalia, including two containers of lactose, three digital scales, a hand mixer, a bill counter, plastic baggies, and a heat sealer. This contraband would have still been on the streets as a direct result of the defendant's offense conduct.

The volume of firearms and ammunition seized is also relevant to the nature and circumstances of this offense. Bedenfield chose to move his contraband in an attempt to hide it from law enforcement. But he could also have chosen to protect his heroin trafficking operation, and used that significant amount of firepower on the police when they arrived to execute the arrest and search warrants. Defendant's actions could have gotten his fellow police officers killed.

For all of these reasons, and contrary to defendant's argument, the guidelines do not overstate the seriousness of this crime. The nature and circumstances of this offense warrant a sentence at the low end of the guidelines range.

### B. History and Characteristics of the Defendant.

Defendant is 47 years old and was a police officer for 15 years. Defendant touts his record as a police officer. Indeed, the assignments, promotions, and awards, all indicate that he was a good police officer. Moreover, despite a challenging childhood,

defendant used his skill at basketball to improve his circumstances, to get a college degree, and compete at the highest levels of the collegiate game. He then chose to return to his community and to serve the public, first in social work and then by protecting the community in his role as a Chicago Police Officer.

However, it is defendant's extensive experience as a police officer, and his experience with and commitment to the community, that aggravate rather than mitigate this crime. This defendant understood exactly what the consequences of his actions would be. Defendant knew that a foreseeable consequence of passing information about a covert investigation to a known associate of a lead target, is that the associate would then pass that information on to the lead target. A target that defendant knew was selling massive quantities of heroin to a known street gang that controlled the neighborhood near Douglas Park. And, as defendant well knew, heroin traffickers use firearms to protect their heroin.

In his sentencing memo, defendant has not yet admitted to the offense conduct and has not yet explained why he did what he did. The government's supposition—that he was just trying to help an old friend—is the most rational reason based upon these facts. While it is troubling that he has yet to explain his conduct, by doing so he is also ignoring the most glaring flaw in his argument concerning his character because he ultimately failed his duties as a law enforcement officer in the most egregious way. Defendant failed to exercise good judgment. He chose to help a subject of an investigation over protecting his own team. He chose to sacrifice his integrity and the integrity of the investigation by breaching the trust of the community he

10

swore to protect. Defendant's history and characteristics warrant a sentence at the low end of the guidelines range.

### C. Seriousness of the Offense and the Need to Promote Respect for the Law, Provide Just Punishment, and To Afford Adequate Deterrence.

Defendant's conduct strikes at the heart of the justice system. The system relies on the integrity of its law enforcement officers. Without that trust, police officers cannot effectively execute their duties because their lives and the safety of the community are at stake. Officers must trust that their safety, their hard work, and the integrity of their investigations will be treated with the requisite amount of care and confidentiality. If officers were permitted to pick and choose which subjects get to evade prosecution, or to reveal planned covert police activity to whomever they wanted, the entire system would break down. Defendant's actions also further erodes the communities trust in the police. Every time a police officer breaks the law, the entire law enforcement institution suffers the erosion in that trust.

Further, this defendant was not just a beat officer, he was assigned to an elite narcotics team. As a result, he was trusted with the most sensitive information involving investigations that targeted the most dangerous drug traffickers and violent street gangs in Chicago. The breach of his duty as a police officer could have had the direct consequence of enabling the very targets he was entrusted with investigating and prosecuting.

Those targets were heroin traffickers, who thrived on the misery of drug addiction that plagues the United States, including the heroin addiction currently

11

afflicting Chicago. Bedenfield's heroin distribution directly contributed to this crisis, and had a significant impact on the lives of many, including the addicts that purchased the narcotics, the family, friends, and employers of those drug abusers, and the community left with the aftermath of addiction and violence that accompanies drug trafficking and abuse. Defendant's offense conduct could have resulted in over 4,000 hits of heroin remaining available for distribution, along with the firepower that could have been used protect that valuable stash of heroin. Defendant's sentence should reflect the seriousness of this offense.

Finally, defendant's sentence should be severe enough to adequately deter other police officers from engaging in this conduct. Defendant detailed the sentences in cases in which police officers were convicted of a variety of crimes unlike the offense this defendant committed. In those cases, the officers sold drugs and guns, physically assaulted suspects, or stole money. For all of the reasons detailed above, this offense conduct is serious for a different reason, because it impacts the integrity of the system. Defendant put his entire team of police officers and the safety of the community at risk by leaking confidential information about a covert investigation. The seriousness of this offense cannot be overstated. As a result, it is imperative that the sentence reflect the seriousness of this offense in order to deter other police officers from engaging in similar conduct. Accordingly, a sentence at the low end of the advisory Guidelines range will provide just punishment for defendant's offense, promote respect for the law, and afford adequate deterrence.

12

## IV. SUPERVISED RELEASE

The government agrees with the Probation Office's recommendations for the conditions of supervised release to be imposed in this matter as the facts underlying the offense and detailed in the PSR support the imposition of those conditions. *See* PSR at 21-26.

### A. Mandatory Conditions

The government respectfully requests that defendant be required to comply with the following mandatory conditions set forth in 18 U.S.C. § 3583(d) and Guideline § 5D1.3(a):

1. Defendant shall not commit another federal, state or local offense.

2. Defendant shall not unlawfully possess a controlled substance.

3. Defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office pursuant to 42 U.S.C. § 14135a(a).

4. Defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests, and up to a maximum of 104 tests thereafter, for use of a controlled substance.

### B. Discretionary Conditions

In addition, the government respectfully requests that defendant be required to comply with the following discretionary conditions permitted by 18 U.S.C. § 3583(d) and Guideline § 5D1.3(c), which serve to facilitate supervision by the

probation officer, support defendant's reintegration into society, and serve to promote deterrence:

1.     Defendant shall seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip defendant for employment, unless excused by the probation officer.

2.     Defendant shall refrain from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in such a specified occupation, business, or profession only to a stated degree or under stated circumstances. Specifically, the defendant shall refrain from any employment as a law enforcement officer.

3.     Defendant shall refrain from knowingly meeting, communicating, or otherwise interacting with any person whom he knows to be engaged, or planning to be engaged, in criminal activity.

4.     Defendant shall refrain from excessive use of alcohol (defined as having a blood alcohol concentration greater than 0.08%), or any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner.

5.     Defendant shall refrain from possession a firearm, destructive device, or other dangerous weapon. 18 U.S.C. § 922(g)(1).

6.     Defendant shall remain within the jurisdiction where defendant is being supervised, unless granted permission to leave by the court or the probation officer.

7.      Defendant shall report to the probation officer as directed by the court or the probation officer.

8.      Defendant shall permit the probation officer to visit the defendant at home, community service location, or other reasonable location specified by a probation officer at any reasonable time, and permit confiscation of any contraband in plain view of the officer.

9.      Defendant shall notify the probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer.

10.      Defendant shall notify the probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

## C.      Special Conditions

Finally, the government respectfully requests that defendant be required to comply with the following special conditions permitted by 18 U.S.C. § 3583(d), which further support defendant's reintegration into society:

1.      If unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, defendant shall perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 500 hours.

2.      Defendant shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

15

3.      Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

## V.      CONCLUSION

For all of the foregoing reasons, the government respectfully requests this Court sentence defendant to a term of imprisonment at the low end of the advisory guidelines range of 97 to 121 months. Such a sentence would reflect the seriousness of the offense, promote respect for the law, and provide a just punishment for the offense as set forth in Section 3553(a)(2)(A).

Dated:        December 7, 2017             Respectfully submitted,

JOHN R. LAUSH, JR.
United States Attorney

By:      /s/ Shoba Pillay
SHOBA PILLAY
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 886-7631